IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE |
|---|---|
| v. | NO. 1:16-CR-145-TWT-JKL-13 |
| DERECK TAYLOR (13) | |

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

This Order and Non-Final Report and Recommendation addresses the following pending motions filed by Defendant Dereck Taylor:

- Motion for Bill of Particulars [Doc. 1026];

- Motion to Suppress Statements [Doc. 1027];

- Motion to Suppress Physical Evidence [Doc. 1028];

- Motion for Pretrial Production of Grand Jury Proceedings, Jencks Act Material, and List of Witnesses [Doc. 1029];

- Motion to Sever [Doc. 1030]; and

- Motion to Reveal the Deal and Information About Government Witnesses [Doc. 1031].

The Court addresses the pending motions in the following order: (1) the motion for a bill of particulars; (2) the motion for pretrial production of grand jury

proceedings, Jencks material, and a list of witnesses and the motion to reveal the deal; (3) the motion to sever; and (4) the motion to suppress physical evidence and the motion to suppress statements.

## I.       SUMMARY OF INDICTMENT

Taylor is charged in this case with RICO conspiracy (Count One).  [*See* Doc. 1.]  In connection with Count One, the indictment alleges that Taylor was a member of the Gangster Disciples, which the government alleges operated as a racketeering enterprise as defined by 18 U.S.C. § 1961(4).  [*Id.* at 6, 14.]  The indictment specifically alleges that Taylor provided security for co-defendant Vertuies Wall, another alleged member of the Gangster Disciples.  [*Id.* at 31 (Overt Act 76).]  On December 12, 2014, Taylor, Wall, and other Gangster Disciples members allegedly met outside Wings Café, a nightclub known to be frequented by rival Crips gang members.  [*Id.* (Overt Act 75).]  Before entering the nightclub, Taylor allegedly retrieved a firearm from Wall.  [*Id.*]  Wall, Taylor, and other Gangster Disciples then allegedly entered the nightclub and provoked an altercation with the Crips. [*Id.*]  Allegedly, Crips gang members retaliated, and during the exchange, a Gangster Disciples member, M.P., shot and killed a Crips gang member.  [*Id.*]

More gunfire was exchanged, killing two other individuals and injuring three more, who are identified only by their initials, M.P., J.F., and N.T.  [*Id.*]

The indictment additionally alleges that, on March 1, 2015, Taylor "and another Gangster Disciples member shot at individuals in a vehicle after getting into an altercation with them at a nightclub."  [Doc. 1 at 32 (Overt Act 84).]

## II.   MOTION FOR BILL OF PARTICULARS [DOC. 1026]

In his motion for a bill of particulars, Taylor makes three general requests. First, he requests additional detail about the gunfight at the Wings Café described in Overt Acts 75 to 78 of the indictment, namely, whether he is "accused of committing any specific acts during the altercation" other than "retriev[ing] a firearm from Defendant WALL" and the identity of eyewitnesses M.P., J.F., and N.T., whom the indictment identifies as having been injured during the shooting. [Doc. 1026 at 3.]  Second, in reference to the alleged March 1, 2015 vehicle shooting, Taylor states that he understands from discovery that the government alleges Christopher Powell was the driver of the vehicle in which Taylor was a passenger, but he requests that the government explain whether it contends that Powel was a member of the Gangster Disciples.  [*Id.* at 3-4.]  Third, Taylor argues that he needs to know whether the government contends, and will present evidence

3

at trial, that he participated in any other overt act in furtherance of the RICO conspiracy alleged in Count One.  [*Id.*]

The government responds that Taylor's request for a bill of particulars is an impermissible attempt to compel disclosure of the government's theory regarding evidence already in his possession.  [Doc. 1092 at 3-4.]  The government also states that, before the Wings Café gunfight, Taylor provided the gun to Wall, who did not shoot during the gunfight; Taylor took part in the fight that preceded the shooting; and, after the gunfight, Taylor tried to retrieve Wall's gun.  [*Id.* at 4.]  In response to Taylor's request for the identities of the injured victims, the government states that it has provided the names of the victims directly to Taylor's counsel.  [*Id.*]  Finally, the government confirms, somewhat obliquely, that it contends that Powell is the alleged Gangster Disciple member who was driving the vehicle during the March 1, 2015 shooting.  [*Id.* at 5.]

Taylor filed a reply, in which he maintains that he cannot prepare his defense without knowing what he is accused of doing at Wings Café during the gunfight. [Doc. 1120 at 2.]  He contends that there is surveillance footage of him leaving the Wings Café without participating in the shooting, and if the government's "entire theory" is that he left Wings Café before the shooting, it should say so.  [*Id.* at 2.]

4

He also argues that the discovery material does not show that anyone else at the scene of the car chase in Overt Act 84 was a member of the Gangster Disciples, so, he maintains, he cannot prepare his defense with respect to that overt act.  [*Id.* at 2-3.]  Taylor acknowledges, though, that the government agreed to produce the names of the Wings Café shooting survivors, so that issue is resolved.  [*Id.* at 1 n.1.]

Federal Rule of Criminal Procedure 7(f) explains that:

> The court may direct the government to file a bill of particulars.  The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits.  The government may amend a bill of particulars subject to such conditions as justice requires.

Fed. R. Crim. P. 7(f).  The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (citation omitted).  A bill of particulars may not be used for the purpose of obtaining detailed disclosure of the government's case or evidence in advance of trial.  *See United States v. Perez*, 489 F.2d 51, 70-71 (5th Cir. 1973).  "Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the

indictment or discovery and inspection." *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 2016), *modified on other grounds by*, 801 F.2d 378 (11th Cir. 1986).

The government has provided Taylor with much of the detail concerning the Wings Café shooting and the shooting in Overt Act 84 that he sought in his motion. Taylor's contention in his reply that the government must provide additional information about those events is not persuasive. The government has identified the actions that it contends Taylor took at the Wings Café shooting and it has confirmed, albeit obliquely, that Powell is the "other" Gangster Disciples member referenced in the indictment. To the extent that Taylor seeks particularized detail these or other overt acts, the Court finds that request to be without merit. Overt acts are not elements of a RICO conspiracy. *See Salinas v. United States*, 522 U.S. 52, 63 (1997); *see United States v. Henley*, No. 1:16-cr-151-LMM-JFK, 2017 WL 2952821, at *16 (N.D. Ga. May 19, 2017) (denying motion for bill of particulars seeking details concerning overt acts taken in furtherance of extortion and drug conspiracies), *report and recommendation adopted*, 2017 WL 2918954 (N.D. Ga. July 7, 2017). As such, Taylor "is not entitled to an accounting of the 'overt acts' he committed in furtherance of [the charged conspiracy]." *Henley*, 2017 WL

6

2952821, at *16; *see also United States v. Coleman*, No. 1:07-CR-233-ODE-RGV, 2010 WL 11507843, at *7 (N.D. Ga. Feb. 24, 2010) ("A bill of particulars cannot be used to ferret out additional overt acts not listed in the indictment, as long as the indictment alleges the required number of overt acts under the statute being charged."), *report and recommendation adopted*, 2010 WL 11515338 (N.D. Ga. May 18, 2010). Additional detail is not warranted under Rule 7(b) and is not necessary for Taylor to prepare his defenses, minimize surprise at trial, and enable him to plead double jeopardy if later prosecuted for the same offense.

Finally, Taylor argues that there is evidence that he did not participate in the entire Wings Café altercation, and that Overt Act 84 should not be in the indictment if the government cannot show that the shooting was done in connection with another Gangster Disciples member.  Taylor's belief that the government will not be able to prove that he was involved in part of the Wings Café altercation or that Powell was a member of the Gangster Disciples is not the proper subject of a bill of particulars.  *See Davis*, 854 F.3d at 1293.  It is not even the proper subject of a motion to dismiss the indictment.[1]  *See* Fed. R. Crim. P. 12(b); *United States v.*

---

[1] It also bears noting that the Court is aware of no requirement that a defendant's activity in furtherance of a racketeering conspiracy be carried out in the presence of other participants in the conspiracy.

*Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987) ("[A] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.").

Accordingly, Taylor's Motion for a Bill of Particulars [Doc. 1026] is **DENIED**.

### III.   MOTION FOR ACCELERATED PRODUCTION [DOC. 1029] AND MOTION TO REVEAL THE DEAL [DOC. 1031]

Taylor also seeks the production of all grand jury testimony, Jencks material, and a list of the government's trial witnesses, with their criminal histories, at least 10 days prior to trial.  [Doc. 1029.]  Essentially, Taylor contends that pretrial disclosure of this information is "critical to his defense in this case."  [*Id.* at 6.]

In his motion to reveal the deal, he also seeks information about any formal or informal agreements the government has with witnesses expected to testify at trial; the witnesses' possible expectations or understandings as to benefits they may receive; the benefits that may actually be provided to such witnesses, and any other agreement or understanding that could "conceivably" influence the conduct or testimony of witnesses in this case.  [Doc. 1031.]

The Court addresses each category of his requests below:

8

## A.   Early Jencks Disclosure

Taylor requests that the government be ordered to disclose Jencks materials in advance of trial so that he may adequately prepare his defense.  [Doc. 1029 at 9-12.]  The government responds that the Court is not authorized to order early Jencks disclosure, but in any event, it plans to disclose Jencks materials 14 days before the witness testifies.  [Doc. 1074 at 1-3.]  In his reply, Taylor states that he accepts the government's offer to disclose Jencks materials 14 days before the witness testifies. [Doc. 1119 at 4.]

For starters, the government is correct that, under the Jencks Act itself, the Court is not authorized to order early an early Jencks disclosure.  The Jencks Act requires that a witness statement be produced only after the witness testifies.  18 U.S.C. § 3500(b).[2]  The Jencks Act provides no authority for the Court to grant an

---

[2] The Jencks Act provides in relevant part as follows:

> ***After a witness called by the United States has testified on direct examination***, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the ***witness has testified***. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(b) (emphasis added).

9

early release or disclosure of that material.  *See United States v. Jordan,* 316 F.3d 1215, 1227 n.17, 1251 & n.78 (11th Cir. 2003); *United States v. Jones,* No. 1:05-CR-617-WSD, 2007 WL 2071267, at *14 (N.D. Ga. July 19, 2007) ("The Jencks Act materials . . . are not subject to disclosure until the government witness testifies at trial on direct examination, or earlier if the government agrees."), *adopted at* *3-4.  In any event, because Taylor finds the government's offer to disclose Jencks material 14 days before trial acceptable, the Court considers this matter resolved.

### B.    All Grand Jury Testimony

In addition to Jencks material, Taylor requests that the Court order the government to produce, before trial, all statements made to the grand jury in this case, Jencks or otherwise.  [Doc. 1029 at 7-9.]  He contends he has a particularized need for the grand jury materials because "evidence was seized and obtained at different locations from co-defendants and parties other than [Taylor]," and because he maintains that he is innocent of the RICO charge.  [*Id.* at 8.]  Taylor seems to acknowledge that he may receive some of this information from the government pursuant to its Jencks and *Giglio*[3] obligations, but he argues that such

---

[3] *Giglio v. United States*, 405 U.S. 150 (1972).

10

disclosure will be untimely, as it will not allow him to prepare adequately for trial. [*Id.* at 3-5, 9.]

The government responds that Taylor has not shown that he is entitled to all grand jury testimony.   [Doc. 1074 at 3-5.]   The government submits that it understands its obligations under *Brady*[4] and *Giglio* and will produce such materials and statements in accordance with those obligations.  [*Id.* at 3-4.]  But, the government argues, Taylor has no blanket entitlement to grand jury testimony, and providing grand jury testimony in this case might expose grand jury witnesses to retaliation by the Gangster Disciples.  [*Id.* at 5.]

In his reply, Taylor argues that his counsel is best-suited to determine whether the testimonies of grand jury witnesses support his defense or would be useful for impeaching government witnesses.  [Doc. 1119 at 1-3.]  He further argues that the government would not be prejudiced by disclosure of grand jury testimony because there is no evidence that he poses a threat to anyone, and protective orders limit the disclosure of information produced by the government. [*Id.* at 3-4.]

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

Federal Rule of Criminal Procedure 6(e) codifies the traditional rule of grand jury secrecy. *United States v. Aisenberg*, 358 F.3d 1327, 1346-47 (11th Cir. 2004); *see also Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218-19 (1979) (discussing why "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings"). In limited circumstances, however, the Court may order disclosure of grand jury materials. Fed. R. Crim. P. 6(e)(3); *Aisenberg*, 358 F.3d at 1347-48. The Court may order disclosure of grand jury materials, *inter alia*, preliminary to or in connection with a judicial proceeding, but only where the party seeking disclosure shows a "particularized need" for the material." *Aisenberg*, 358 F.3d at 1348; *see also United States v. Abusaid*, 256 F. App'x 289, 290 (11th Cir 2007). A blanket request for all grand jury materials does not satisfy the "particularized need" requirement. *Aisenberg*, 358 F.3d at 1348-49 (explaining that "particularized need" may be shown by circumstances creating difficulties "peculiar to this case, which could be alleviated by access to *specific* grand jury materials, without doing disproportionate harm to the salutary purpose of secrecy embodied in the grand jury process").

Here, Taylor merely speculates that the grand jury materials will assist him in cross-examination or in preparing his defense because there are many defendants

and many sources of evidence in this case.  The same could be said for virtually any defendant facing a multi-defendant indictment, so he cannot show that the circumstances of this case have created particular or unusual difficulties.  Further, Taylor's speculation that the grand jury proceedings may be helpful is not enough to outweigh the need for secrecy in this case, which involves an ongoing prosecution of a violent gang.  His request for pretrial disclosure of grand jury proceedings is therefore due to be denied.

### C.    The Government's Witness List

Taylor next argues that he is entitled to the government's witness list 10 days before trial so that he may adequately investigate the witnesses and determine whether any potential jurors know the government's witnesses.  [Doc. 1029 at 12-14.]  The government responds that Taylor has no absolute right to a list of witnesses before trial and that the Court, not the defendant, generally receives the witness list and determines whether to reveal the list to prospective jurors.  [Doc. 1074 at 5.]  In his reply, Taylor submits that the Court should weigh the benefit to the defense against the prejudice to the government if it were to provide its witness list two weeks before trial.  [Doc. 1119 at 5.]  Taylor contends that having access to the witness list two weeks prior to trial is "extremely helpful, if not critical, to

13

preparing the defense," while there is no corresponding unfair prejudice to the government.  [*Id.*]

It is well-settled that a criminal defendant has no constitutional right to witness lists or witness statements before trial.  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."); *see also United States v. Johnson*, 713 F.2d 654, 659 (11th Cir. 1983) ("A criminal defendant has no absolute right to a list of the government's witnesses in advance of the trial.").  Nor does Federal Rule of Criminal Procedure 16 require the disclosure of the identities of government witnesses.  *See United States v. Aiken*, 76 F. Supp. 2d 1339, 1343 (S.D. Fla. 1999) ("Under [Rule 16], there is no authority requiring the Government to supply witness lists or witness statements until that witness has testified on direct examination, unless such information is required sooner by *Brady* or *Giglio*.").

The Court nonetheless has discretion to require the production of witness lists in advance of trial.  *See United States v. Elder*, No. 1:10-CR-132-RWS-AJB, 2010 WL 5656687, at *6 (N.D. Ga. Dec. 16, 2010), *report and recommendation adopted in relevant part*, 2011 WL 294507 (N.D. Ga. Jan. 27, 2011).  "To obtain a

14

witness list, a defendant must show that the 'list would be material to the preparation of the defense.'" *Id.* (quoting *Downing v. United States*, 348 F.2d 594, 599 (5th Cir. 1965)).  The Eleventh Circuit has held that a defendant could not show that a witness list was material to the preparation of his defense where the witnesses were persons with whom he had "significant personal or financial relations."  *See United States v. Colson*, 662 F.2d 1389, 1392 (11th Cir. 1981).

Although the Court appreciates Taylor's desire to prepare for the testimony that the government's witnesses may offer, that concern alone does not entitle him to a list of the government's witnesses.  Furthermore, the trial testimony that is likely to be most significant for Taylor, in addition to video evidence showing his involvement in the Wings Café altercation, is the testimony of witnesses who can show his membership and involvement in the Gangster Disciples.  Such witnesses are likely individuals with whom he has "significant personal . . . relations."  *See Colson*, 662 F.2d at 1392.  In addition, Taylor will receive information about the government's witnesses through the government's Jencks Act disclosure.  So, at a minimum, Taylor will have at least two weeks' notice of the identities of the witnesses for whom the government has Jencks material.  Accordingly, the Court will not require early disclosure of the government's witness list.  *See United States*

*v. Pineda*, No. 1:11-CR-006-CAP-JFK, 2012 WL 2906758, at *44 (N.D. Ga. June 4, 2012) (denying request for pretrial disclosure of the government's confidential informants on similar grounds), *adopted by* 2012 WL 2907447, at *1 (N.D. Ga. July 16, 2012).

### D.   Early Impeachment Materials, Including Witness's Criminal Histories and Agreements with the Government

In his motion for early disclosure, Taylor argues that he is entitled to the criminal records of all government witnesses under *Brady*, and that such information must be disclosed sufficiently before trial to be used effectively.  [Doc. 1029 at 13-14.]  In his motion to reveal the deal, he argues that he is entitled to any information about benefits—including payments, agreements not to prosecute, leniency, and any other benefit the witness obtained or hopes to obtain—from the government in exchange for testifying or cooperating.  [Doc. 1031 at 1-5.]  Taylor demands contact information, Social Security numbers, immigration numbers, and criminal history for every witness.  [*Id.* at 4.]  He also argues that he is entitled to the following information about each witness: (1) federal agency files relating to the witness; (2) criminal records; (3) psychological/psychiatric history; (4) deceptive or inconclusive polygraph results; (5) reports or documentation showing deals or arrangements with the government; (6) payment records showing benefits

16

offered to or received by the witness; and (7) federal income tax records showing the witness has received compensation.  [*Id.* at 6.]

The government responds that there is no right to early disclosure of *Giglio* material.  [Doc. 1074 at 5-6.]  "A defendant does not generally have a right to early disclosure of impeaching information," and here, the government's "agreement to abide by its *Brady*, *Jencks* and *Giglio* obligations . . . [is] sufficient."  *Pineda*, 2012 WL 2906758, at *44 (citation omitted).  The government also objects to producing *Giglio* material because early disclosure may endanger the safety of witnesses.  The government specifically points to the nature of the acts alleged in the indictment, including retaliation against witnesses.  [Doc. 1074 at 7.]

The Court agrees with the government.  The Court's pretrial scheduling order directs the government to provide all materials and information in compliance with its obligations under *Giglio*.  [Doc. 272 at 6.]  The scheduling order further provides that a party can request a modification of this standard ruling by filing a particularized motion for relief.  [*Id.* at 5.]  Here, Taylor is specific about the type of information he is seeking, but he has not shown why early disclosure of that information is required.  For example, if a witness has a cooperation agreement with the government, as long as Taylor is aware of that agreement before cross-

examination, he has what he needs to challenge the witness's credibility effectively. Moreover, the government has indicated that it will provide Jencks Act material approximately 14 days before the witness testifies, and the Court presumes that the government intends to disclose any *Giglio* materials at that time as well, if not earlier. The Court reminds the government of its *Giglio* and *Brady* obligations, but it will not order early disclosure of *Giglio* material or order disclosure of witnesses' contact information before trial.

In sum, Taylor's motion for accelerated disclosure [Doc. 1029] and his motion to reveal the deal [Doc. 1031] are **DENIED**.

## IV.    MOTION TO SEVER [DOC. 1030]

### A.    The Parties' Arguments

Taylor moves for severance on the grounds that he has been improperly joined as a defendant in this case or, alternatively, that he should be severed due to prejudicial spillover. [Doc. 1030.] He argues that he is alleged to have participated in overt acts committed in furtherance of the conspiracy on only two days. [*Id.* at 2.] He also argues that he intends to call co-defendant Vertuies Wall as a material witness at trial to establish that Taylor did not commit the overt acts alleged in the indictment, and that he reasonably expects that Wall may not testify in a joint trial.

18

[*Id.* at 3.]   He contends that a jury will face "insurmountable difficulty" in separating Taylor's alleged acts from those of the other defendants, and that he will be prejudiced by evidence introduced against other defendants.  [*Id.* at 3-4.]  He also contends that a separate trial would be "short, succinct and clear" and would serve the interests of justice and judicial economy.  [*Id.* at 4.]  He also asserts the potential for a *Bruton*[5] problem in that statements of non-testifying co-defendants may be admitted against him, and he would have no opportunity to cross-examine and impeach those defendants.  [*Id.* at 4-5.]

The government responds that joinder is proper here because Taylor should be tried alongside other defendants, including the codefendants who were allegedly involved in the Wings Café shooting.  [Doc. 1088 at 2-3.]  The government contends that joinder is appropriate under Rule 8(b) because Taylor participated in the RICO conspiracy charged in Count One.  [*Id.* at 3-4.]  The government also contends that severance is not warranted due to Taylor's desire to call Wall as a witness at trial.  [*Id.* at 4-6.]  The government maintains that it is not certain that

---

[5] *Bruton v. United States*, 391 U.S. 123 (1968).  In *Bruton*, the Supreme Court held that post-arrest statements made by a non-testifying co-defendant that incriminate other defendants are inadmissible because such statements violate the other defendants' Sixth Amendment rights to confront and cross-examine adverse witnesses.  *Bruton*, 391 U.S. at 126.

Wall would, in fact, testify at trial, as he would have a Fifth Amendment privilege against self-incrimination.  [*Id.* at 5-6.]  The government submits that Taylor has not met his burden of showing incurable prejudice that would result absent severance under Federal Rule of Criminal Procedure 14, and that any possible prejudice can presumptively be cured by cautionary instruction to the jury.  [*Id.* at 6-8.]

Taylor has filed a reply, in which he concedes that his argument regarding the potential testimony of Wall is premature at this time.[6]  [Doc. 1118 at 1.]  He nonetheless maintains that because the indictment alleges that he was involved in just one incident that involves one of his codefendants, he has been improperly joined as a defendant under Rule 8(b) and the danger of prejudicial spillover requires severance under Rule 14.  [*Id.* at 2-3.]

_____

[6] The Court considers that argument withdrawn for purposes of this motion, but it is noted that Taylor's argument that Wall would provide exculpatory testimony is also speculative.  Under Rule 14, joinder may be prejudicial where one defendant would exculpate the other in a separate trial but will not testify in a joint trial.  *United States v. Chavez*, 584 F.3d 1354, 1360 (11th Cir. 2009).  To make even a threshold showing for severance on that basis, the defendant must show (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) the exculpatory nature and effect of the testimony, and (4) that the codefendant would indeed have testified in a separate trial.  *United States v. Browne*, 505 F.3d 1229, 1269 (11th Cir. 2007).  Taylor has not made the requisite showing on any of those requirements here.

**B.     Analysis**

Federal Rule of Criminal Procedure 8(b) provides that joinder of defendants is proper "if they are alleged to have participated in the same . . . series of acts or transactions constituting an offense or offenses."  To meet the "same series of acts or transaction" requirement of Rule 8(b), the government must demonstrate that the acts alleged are united by substantial identity of facts or participants; however, there is no requirement that each participant participate in all acts or even know the other participants' roles in the alleged activities.  *United States v. Holloway*, 971 F.2d 675, 679 (11th Cir. 1992).

Joinder is proper where, as here, the indictment charges multiple defendants with participation in a single conspiracy.  *See United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985).  The general rule is that defendants indicted together should be tried together, especially in conspiracy cases.  *Chavez*, 584 F.3d at 1360. "Joint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources."  *United States v. Lopez*, 649 F.3d 1222, 1233 (11th Cir. 2011).

21

Taylor's argument that he has been improperly joined as a defendant is without merit. Rule 8(b) is a pleading rule, and courts look to the indictment to determine whether joinder is proper under that rule. *See United States v. Liss*, 265 F.3d 1220, 1227 (11th Cir. 2001); *United States v. Melvin*, 143 F. Supp. 3d 1354, 1363 (N.D. Ga. 2015). Based on the allegations in the indictment, the Court readily concludes that joinder is proper under the "same series of acts or transaction" requirement of Rule 8(b).

Because joinder is proper under Rule 8(b), the Court turns to Taylor's contention that he should be severed due to prejudicial spillover. Federal Rule of Criminal Procedure 14 allows for severance if it appears that a defendant will be prejudiced by a joinder of offenses or defendants. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The Eleventh Circuit has explained that "[s]everance . . . is warranted only when a defendant demonstrates that a joint trial will result in 'specific and compelling prejudice' to his defense." *Liss,* 265 F.3d at 1228 (citation omitted). "Compelling prejudice occurs when the jury is unable 'to separately

22

appraise the evidence as to each defendant and render a fair and impartial verdict.'" *Id.* (quoting *United States v. Meester*, 762 F.2d 867 (11th Cir.1985)).  Cautionary instructions to the jury are presumed to adequately safeguard against prejudice.  See *Lopez*, 649 F.3d at 1235 (cautionary instructions to the jury "ordinarily will mitigate the potential spillover effect of evidence of a co-defendant's guilt").

The Court is not persuaded that the arguably limited nature of Taylor's alleged involvement in the conspiracy warrants severance under Rule 14.  Taylor's concern that a jury will be unable to sift through the evidence at trial and make an individual determination of guilt as to him is a concern in virtually any multi-defendant conspiracy case where the participants have disparate levels of participation.  As the Eleventh Circuit has explained, the general rule favoring joinder of defendants who have been indicted together applies to coconspirators, even if one defendant had a minimal level of participation in the conspiracy.  *United States v. Leavitt*, 878 F.2d 1329, 1340 (11th Cir. 1989) ("In a conspiracy case, coconspirators should usually be tried together; the fact that a defendant only participated in one aspect of the conspiracy does not by itself warrant severance.").  Whatever risk there may be can likely be cured through limiting instructions to the jury.  *See Zafiro*, 506 U.S. at 539.  Accordingly the Court concludes that, at this

23

point, Taylor has not demonstrated that he would suffer such compelling prejudice to mandate severance.

For the foregoing reasons, it is **RECOMMENDED** that Taylor's Motion to Sever Defendants [Doc. 1030] be **DENIED**.  It bears mentioning, however, that severance is within the discretion of the trial judge, who must ultimately balance the efficient and orderly presentation of the case with the possibility of prejudice to defendants and the ability to cure such prejudice with instructions.  This is a complex case involving many defendants and issues may arise as this matter moves toward trial that may justify another look at severance of this and other defendants for trial.  Taylor has not yet made a threshold showing for severance on grounds that Wall may provide exculpatory testimony, but he may be able to do so closer to trial.  Nor is it apparent at this time whether there is a *Bruton* problem, as Taylor has not identified any specific statement or testimony that might be offered at trial, nor has he identified any co-defendant who made a statement or whether such defendant is going to trial.  Although I recommend denying the motion at this stage in the proceedings, the trial judge may, of course, revisit the question of severance closer to trial.  *See United States v. Alcindor*, No. 1:05-CR-0269-TWT-CCH, 2005 WL 8148993, at *5 (N.D. Ga. Dec. 7, 2005) (denying motion for severance but

24

noting that severance is within the province of the trial judge), *report and recommendation adopted*, 2006 WL 8426658 (N.D. Ga. Mar. 10, 2006).

## V.   MOTION TO SUPPRESS PHYSICAL EVIDENCE [DOC. 1028] AND MOTION TO SUPPRESS STATEMENTS [DOC. 1027]

Taylor seeks to suppress physical evidence seized and statements he made to police after he was arrested following a traffic stop on March 1, 2015. [Docs. 1027, 1028.] Below, I summarize the relevant evidence and the parties' arguments, and I explain why the motions to suppress should be denied.

### A.   The Evidentiary Hearing

On November 15, 2017, I held an evidentiary hearing on Taylor's motions to suppress. Deputies Joshua Jones and Doug Smith and Lieutenant David Vaughn, who were law enforcement officers with the Bibb County Sheriff's Office at the time relevant to this case, testified at the hearing. [*See* Doc. 1273-2 ("Tr.").] Taylor also testified, but, as explained below, his testimony was struck after he invoked his Fifth Amendment privilege on cross examination. The following evidence was adduced at the hearing:

Early in the morning on March 1, 2015, at around 3:00 or 4:00 a.m., Deputies Joshua Jones and Doug Smith of the Bibb County Sheriff's Office were parked next to a gas station in Macon, Georgia. (Tr. 7-8, 15, 19, 40-41.) The deputies

heard a radio dispatch alerting them that a red Chevrolet Impala was being pursued by a blue Acura, and an occupant of the Acura was shooting at the Impala. (Tr. 10, 41.) The chase was occurring not far—about a mile and a half—from where Deputies Jones and Smith were parked. (Tr. 19.) The deputies then heard a new dispatch that the Impala had reached a Sheriff's Office station, which was less than an eighth of a mile from where the deputies were parked. (Tr. 11, 20, 41.) Less than a minute after the initial dispatch, the deputies saw an Acura drive by their location. (Tr. 34.) At that time of night, traffic was relatively light. Deputy Jones estimated that two or three cars drove by every five or ten minutes. (Tr. 13.) Deputy Smith testified, less precisely, that "less than a hundred" cars drove by in 15 minutes. (Tr. 43.) The color of the Acura appeared to match the description of the Acura in the dispatch (Tr. 14, 41), although, later, photographs of the Acura showed that it was in fact gray in color [Doc. 1268-1 at 2-3].

Deputies Jones and Smith pulled out of the gas station and attempted to stop the Acura. (Tr. 14-16, 42.) Once behind the Acura, Deputy Jones activated his blue lights, and then, because the Acura did not immediately stop, he ran his siren. (Tr. 15-16.) The Acura traveled between a quarter mile and half mile before coming to a stop in a Krystal restaurant parking lot. (Tr. 14, 42.) The deputies

ordered the occupants to exit the car.  (Tr. 14.)  Taylor was a passenger in the Acura.

(Tr. 66.)  The other occupant, the driver, was Christopher Powell.  (*See* Tr. 22, 26,

77.)  The deputies secured the scene by handcuffing Taylor and Powell. (Tr. 14.)

After Taylor and Powell were secured, Deputy Smith retraced the path the

Acura took into the Krystal parking lot and found a gun at the entrance of the

parking lot. (Tr. 43.)  The gun was on the side of the entrance nearest the passenger

side of the Acura as it pulled into the lot.  (Tr. 43-45.)

Lieutenant David Vaughn, who supervised deputies on patrol, heard about

the shooting and traffic stop over the radio.  (Tr. 63-65.)  He was near the scene of

the traffic stop and drove to the Krystal.  (Tr. 65.)  He arrived after deputies had

removed Taylor and Powell from the car.  (Tr. 66.)  One of the deputies on the

scene told Lieutenant Vaughn that "it [was] possible the vehicle was doing the

shooting."  (*Id.*)  Lieutenant Vaughn felt that the incident needed further

investigation so, pursuant to Sheriff's Office policy, he called for an investigator.

(Tr. 67.)  Lieutenant Vaughn and the deputies returned to the station.  (Tr. 67-68.)

Deputy Jones transported Taylor to the station in his cruiser.  (Tr. 15, 25.)  Deputy

Jones did not ask questions of Taylor, converse with him, take statements from

him, or do a search of the Acura after detaining him.  (Tr. 14-15.)  Deputy Smith

was not aware of anyone questioning Taylor.  (Tr. 53.)

The incriminating statement Taylor seeks to suppress is a statement he made

to Lieutenant Vaughn that was recorded in a police report that Lieutenant Vaughn

approved, but did not personally write.  (Tr. 73-75; *see* Tr. 69-72.)  According to

the police report, Taylor stated that "he was just firing the weapon to get their

attention."  (Tr. 75.)

By the time of the evidentiary hearing, Lieutenant Vaughn no longer

specifically recalled Taylor making that statement.  (Tr. 73.)  He testified, however,

that he would not have approved the police report if he did not (at the time)

remember Taylor making the statement, and he "would not have approved the

report if it's something [he] didn't have knowledge of."  (Tr. 74.)  He also testified,

"[P]ossibly we were just standing in the room where we were waiting on the

investigator to show up and he made the statement at that point in time."  (Tr. 73-

74.)  As a matter of department protocol and his own practice, Lieutenant Vaughn

did not question suspects when an investigator was involved in a case.  (Tr. 75-76.)

Lieutenant Vaughn and other officers would record in police reports any statements

made by a suspect to an officer, or by an officer to a suspect.  (Tr. 71, 76.)  To

28

Lieutenant Vaughn, the fact that the report did not reflect any questioning by police indicated that Taylor was not questioned at that time.  (Tr. 71.)  Later, the investigator arrived and spoke with Taylor and Powell.  (*See* Tr. 80, 90-91.)

Taylor also testified at the evidentiary hearing.  (Tr. 99-100.)  Before he testified, the Court advised him of his Fifth Amendment privilege against self-incrimination.  (*Id.*)  Taylor testified that, after he was brought to the station, he and Powell were taken to a back room together.  (Tr. 101-03.)  Initially, Lieutenant Vaughn questioned them together, but neither of them spoke.  (*Id.* at 102-03.)  Powell was taken to the front of the station, and later released, while another officer remained with Taylor.  (Tr. 103.)  The officer told Taylor, "I'm just going to tell you what's going on.  The folks in the car ain't trying to press no charges on you, but just go ahead and tell me what . . . happened."  Taylor declined to answer the question.  (*Id.*)  Later, Taylor was taken to another office, and a deputy threatened to charge him with marijuana possession and began questioning him.  (Tr. 103-04.)  Taylor testified that he was not advised of his *Miranda*[7] rights before questioning.  (Tr. 104-05.)

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

On cross-examination, the government asked Taylor whether he was a member of the Gangster Disciples. (Tr. 106-07.) Taylor objected to the question as outside the scope of the direct examination, and the objection was overruled. (Tr. 107.) Taylor then asserted his Fifth Amendment privilege against self-incrimination. (*Id.*) Taylor consulted with counsel, and his counsel renewed his objection to the question, arguing that it was outside the scope of direct and not proper impeachment. (Tr. 107-10.) The Court allowed the ruling to stand, and the government moved to strike the testimony. (Tr. 107, 110.) The government also proffered that membership in the Gangster Disciples requires adherence to a code that entails hostility to law enforcement and prohibits members from cooperating with authorities. (Tr. 109.) The Court struck Taylor's direct testimony. (*Id.* at 110.)

### B.    The Parties' Arguments

In his brief in support of his motion to suppress, Taylor argues that any physical evidence seized as a result of the traffic stop, along with any statements he made to police, should be suppressed because the deputies lacked probable cause to conduct the traffic stop in the first place. [Doc. 1293 at 7-10.] He argues that the deputies were not given sufficient information to identify the Acura from the

30

dispatch call, and the Acura Taylor was riding in was not the same color as the one in the dispatch. [*Id.* 9-10.] Furthermore, there was no evidence that the Acura deputies pulled over was driving from the direction of the shooting, and the occupants of the Acura were not behaving suspiciously before they were pulled over. [*Id.* at 10.]

Taylor also argues that any incriminating statements he made at the station after his arrest must be suppressed because the government failed to prove that he was advised of his *Miranda* rights or that his confession was voluntary. [Doc. 1293 at 11-14.] He argues that the government "deliberately" failed to adduce evidence showing that he made an incriminating statement. [*Id.* at 13.] Even assuming he did confess, Lieutenant Vaughn testified that Taylor was never advised of his *Miranda* rights. [*Id.* at 14.]

Finally, Taylor asserts, the Court erred by striking his testimony after he asserted his Fifth Amendment privilege against self-incrimination when asked whether he was a member of the Gangster Disciples. [Doc. 1293 at 15-19.] He argues that he only testified for a "very very limited purpose," and a question about his membership in the Gangster Disciples was not a proper subject for impeachment. [*Id.* at 16-18.] In addition, he argues, the government asked the

question only for impeachment purposes at trial, and the question was "extremely prejudicial." [*Id.* at 17-19.]

The government responds that the evidence shows that deputies had reasonable suspicion to initiate the traffic stop based on the dispatch description of the Acura, the relatively light traffic flow at the time, and vicinity of the Acura deputies saw to the location of the shooting. [Doc. 1315 at 7-10.] It argues that Taylor's confession was voluntary because, even though he was not given *Miranda* warnings, he made the statement spontaneously without questioning form officers. [*Id.* at 11-12.]

The government contends that the Court should not consider Taylor's testimony because it was properly struck after he asserted his Fifth Amendment privilege and refused to answer the government's question about his Gangster Disciples membership on cross-examination. [Doc. 1315 at 13-18.] Taylor's Gangster Disciples membership was relevant to his credibility because, as the government proffered at the hearing, Gangster Disciples membership requires adherence to a code of hostility to law enforcement, and cooperation with authorities is forbidden. [*Id.* at 14.] Even though Taylor's membership in the Gangster Disciples is at the heart of the allegations against him in this case, there

is no danger that, at a suppression hearing, evidence of his involvement would be unfairly prejudicial, and in any event, Federal Rule of Evidence 403 does not apply. [*Id.* 15-16.]   Moreover, his answer to the question could be used only for impeachment purposes at trial.  [*Id.* at 17.]   The government adds that the Court should not credit Taylor's testimony because his testimony about police conduct was inconsistent with the officers' behavior in court and was inconsistent with the officers' testimony, and because he had an incentive to lie.  [*Id.* at 12, 18.]  Finally, the government argues, the supposed failure to introduce the statement into evidence is immaterial to the issue of suppression.  [*Id.* at 12-13.]

Taylor also has filed a reply.   [Doc. 1341.]   His arguments in reply are addressed below as relevant.

### C.    The Traffic Stop Was Supported at Its Inception By Reasonable Suspicion.

"The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014); *see also United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) (noting that a traffic stop is constitutional if based upon either probable cause to believe a traffic violation has

33

occurred or reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968)).  A determination of reasonable suspicion is based on the "totality of the circumstances." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008).  In determining whether an investigatory stop is justified, the Court need not catch the suspect in a crime.  *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (officers had "more than enough" reasonable suspicion to stop a silver Nissan Xterra where an undercover officer told surveillance officers the suspect was driving a silver Nissan Xterra, predicted the suspect would arrive at a certain place at a certain time, and the suspect appeared to be in communication with the undercover officer by phone while driving).

Here, Deputies Smith and Jones knew from the dispatches that a blue Acura was pursuing and shooting at an Impala, and the shooting was nearby.  There was also limited traffic at that time of night.  Thus, they had reasonable suspicion to conduct a traffic stop of the Acura, which matched the description of the Acura in the dispatch.

Taylor makes much of the fact that the Acura was described as blue in the dispatch but was in fact gray in color.  [Doc. 1341 at 2, 6.]  It was clear from the dispatch that the color of the car was reported to authorities by someone in the

Impala, which was under gunfire.  (Tr. 10.)  Furthermore, it was dark, when deputies could easily confuse the dark gray Acura for a blue one.  The imprecise description of the color of the car is therefore of no moment under the circumstances of this case.  Deputies saw an Acura that they reasonably believed matched the description of the Acura described in the dispatch.

Taylor also argues that the Court should assume street traffic was "substantial" at the time the Acura drove by the gas station because Deputy Jones testified that "less than a hundred" cars would pass the gas station every 15 minutes. [Doc. 1341 at 2-3, 6-7.] The Court does not draw that inference from the testimony. Deputy Smith did not testify as precisely as Deputy Jones about traffic conditions, but he also testified that traffic was "light" or "none," and by contrast, traffic during the day was "very heavy."  (*See* Tr. 43.)

Taylor also argues that there was no evidence that the Acura was moving closer to the deputies [Doc. 1341 at 4, 6], but, just before seeing the Acura, the deputies heard from dispatch that the Impala had reached safety at the station down the street from the gas station.  Thus, there was an additional objective reason for the deputies to believe that the Acura was in close proximity.

35

In sum, the traffic stop was lawful at its inception.[8]  Taylor's argument that the traffic stop was unlawful is without merit.

### D.     Taylor's Inculpatory Statement Was Made Spontaneously and Voluntarily.

As to Taylor's argument about the voluntariness of his statement to Lieutenant Vaughn, the Court finds that his statement was made spontaneously and voluntarily, and not in response to any government questioning.  *See Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous

---

[8] The parties limit their discussion to the initial stop, which Taylor—the passenger in the car—has standing to challenge as explained in *Brendlin v. California*, 551 U.S. 249 (2007).  Because the voluntariness of Taylor's statement not long after his arrest is in issue, the Court notes that, under the circumstances of this case—where Deputies Smith and Jones reasonably suspected that the occupants of the Acura had been chasing a car while shooting at it—they were justified in removing Taylor from the car and handcuffing him at the inception of the stop.  *See United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (officers did not transform an investigatory stop to an arrest by asking armed robbery suspects to leave an apartment and handcuffing them once outdoors); *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("Police may take reasonable action, based upon the circumstances, to protect themselves during [*Terry* stops], or to maintain the status quo.").  Once Taylor and Powell were secured, Deputy Smith retraced the Acura's entrance into the Krystal parking lot and found the discarded or dropped gun.  At that time, officers had probable cause to believe that Taylor was the shooter.  *See United States v. Lopez-Garcia*, 565 F.3d 1306, 1314 (11th Cir. 2009) ("Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.").

36

comments by an accused, even after *Miranda* rights are asserted, are admissible evidence if the comments were not made in response to government questioning."); *see also United States v. Suggs*, 755 F.2d 1538, 1542 (11th Cir. 1985).  Taylor was not questioned by the deputies who arrested him or transferred him to the station. Further, Lieutenant Vaughn's testimony establishes that the incriminating statement was not in response to any questioning by police.  Lieutenant Vaughn testified that his office would record any statement volunteered by a suspect, and the fact that no questions were noted in the police report meant that police did not ask questions or elicit statements from Taylor.  (Tr. 71, 76.)  Otherwise, there is no credible evidence that the statement was made in response to coercive police tactics or that the statement was involuntary.

Taylor contends that the government has not introduced reliable evidence showing that he made an incriminating statement at all.  [Doc. 1341 at 8-9.]  He argues that Lieutenant Vaughn cannot remember the alleged confession and circumstances surrounding it and reviewed the police report only to verify that it was "properly written."  [*Id.* at 5.]  Taylor's characterization of Lieutenant Vaughn's testimony is inaccurate.  Lieutenant Vaughn's testimony shows that he reviewed police reports for substantive accuracy.  (*See* Tr. 71, 73.)  In any event,

37

the admissibility of the statement at trial as a hearsay matter is not for the Court to decide now.  *See also* Fed. R. Evid. 104(a); *United States v. Matlock*, 415 U.S. 164, 172-73 (1974) (noting that the rules of evidence do not "apply with full force" at a suppression hearing).  What matters is that the government has shown that the statement was not made in response to any police questioning.  Taylor's argument that he did not, in fact, make the incriminating statement is not a basis for suppression; it is an issue for trial.  The question here is whether the statement was made voluntarily and free from police questioning, and I find that it was.

I also conclude that Taylor's testimony at the suppression hearing was properly struck.  Federal Rule of Evidence 611(b) provides that, generally, cross-examination should not go beyond the subject matter of direct examination and matters affecting the witness's credibility.  Under Federal Rule of Evidence 104(d), a defendant in a criminal case may testify on a preliminary matter, like a suppression hearing, without subjecting himself to cross-examination "on other issues in this case."  Accordingly, the government's cross-examination of Taylor at the suppression hearing was limited to the voluntariness of his incriminating statement, the circumstances in which he made the statement (or did not make the statement), and the question of whether he was given *Miranda* warnings, but his

"credibility [was] inextricably tied" to those issues. *United States v. Roberts*, 14 F.3d 502, 517 (10th Cir. 1993); *see also United States v. Gomez-Diaz*, 712 F.2d 949, 951 (1983) ("There is no federal right to limit the testimony of a witness on a preliminary matter to one single phase of an issue.").

The government permissibly inquired into whether Taylor is a member of the Gangster Disciples in testing his credibility on cross-examination. Taylor argues that the question was overly prejudicial and irrelevant, but the question of his membership in the Gangster Disciples goes directly to his willingness to be truthful about his encounter with law enforcement.[9] Further, the danger of unfair prejudice contemplated in Federal Rule of Evidence 403 is less of a concern in a suppression hearing because, as explained above, the rules of evidence do not apply with full force in suppression hearings. Nor is the question likely to elicit evidence that would be unfairly prejudicial in the Court's determination of the suppression issues in this case.

---

[9] Taylor also seems to argue that, if he were a Gangster Disciples member, he could not have made an incriminating statement to police, so the government's attempt to impeach him with his Gangster Disciples membership is "inherently contradictory." [Doc. 1293 at 18.] That argument is plainly without merit.

39

In Taylor's view, the government's purpose in asking the question was to generate impeachment evidence in case Taylor testified as trial.  Even if that were the case, the government still had a legitimate reason for testing his credibility at the suppression hearing.

In short, because Taylor invoked his Fifth Amendment privilege to avoid answering that question, it was proper to strike his testimony.  *E.g.*, *United States v. Rodger*, Case No. CR 109-040, 2010 WL 2643268, at *9 (S.D. Ga. Apr. 16, 2010) (striking testimony of defendant for refusal to be cross-examined at his suppression hearing), *adopted by* 2010 WL 2643267 (S.D. Ga. June 30, 2010); *cf. United States v. Diecidue*, 603 F.2d 535, 552 (5th Cir. 1979) (holding that a witness's testimony should be struck for refusal to answer "direct" but not "collateral" matters on cross-examination).

Even if striking Taylor's testimony was too harsh a sanction under the circumstances, the Court does not find that his testimony squarely addressed the incriminating statement at issue here, or that his testimony was credible.  The incriminating statement was made during the discrete period between Taylor's arrival at the station and the arrival of an investigator who could question him.  Taylor did not address that time in his testimony.  Moreover, the gist of Taylor's

testimony was that he did not make an incriminating statement or cooperate with law enforcement, but if he did, he was not Mirandized.  The Court finds that the substance of his testimony, overall and in the context of the other evidence of record at the hearing, was not credible.  The Court also makes this determination in view of its observation of the demeanor of all the witnesses at the suppression hearing.

### E.    Conclusion

In sum, it is **RECOMMENDED** that Taylor's motions to suppress [Docs. 1027, 1028] be **DENIED**.

## VI.   CONCLUSION

For the foregoing reasons, the motion for a bill of particulars [Doc. 1026], the motion for accelerated disclosure [Doc. 1029], and the motion to reveal the deal [Doc. 1031] are **DENIED**.  It is **RECOMMENDED** that the motion to sever [Doc. 1030 ], the motion to suppress physical evidence [Doc. 1028], and the motion to suppress statements [Doc. 1027] be **DENIED**.

There are no matters pending for Defendant Taylor (13), and the Court has not been advised of any impediments to the scheduling of a trial as to this

defendant.  Accordingly, this matter as to this defendant is **CERTIFIED READY FOR TRIAL.**[10]

IT IS SO ORDERED and RECOMMENDED this 23rd day of March, 2018.

_____

JOHN K. LARKINS III
United States Magistrate Judge

---

[10] Since matters pertaining to Taylor's codefendants still are pending, the District Court is not required to place Taylor's case on the trial calendar at this time.  18 U.S.C. § 3161(h)(6).